```
           IN THE UNITED STATES DISTRICT COURT FOR THE
                   SOUTHERN DISTRICT OF GEORGIA
                          AUGUSTA DIVISION
```

| | | |
|---|---|---|
| JASMINE BIANCA MCKENZIE | * | |
| Plaintiff, | * | |
| v. | * | CV 120-157 |
| SOUTHERN NUCLEAR OPERATING COMPANY, | * | |
| Defendant. | * | |

# O R D E R

Before the Court is Defendant's motion for summary judgment. (Doc. 41.) For the reasons set forth below, Defendant's motion is **GRANTED**.

## I. BACKGROUND

This employment discrimination case arises out of Plaintiff Jasmine Bianca McKenzie's employment with Defendant Southern Nuclear Operating Company ("Defendant" or "SNOC"). (Doc. 15, at 2.) On April 12, 2021, Plaintiff, acting *pro se*, filed an amended complaint alleging race and gender discrimination against Defendant. (Id. at 2-3.)

Plaintiff is an African American woman that worked for SNOC at Plant Vogtle, which is in the Southern District of Georgia. (Id. at 2; Doc. 41-2, at 3.) Prior to joining Plant Vogtle in

February 2016, Plaintiff worked for SNOC at Plant Farley in Alabama for three years and was transferred to Plant Vogtle to help improve Plant Vogtle's Planning Department ("Planning Department"). (Doc. 41-2, at 1-2; Dep. of Jasmine McKenzie ("McKenzie Dep."), Doc. 41-3, at 58.)

After transferring into the Planning Department at Plant Vogtle, in which she was the only African American female, Plaintiff received "does not meet expectations" performance reviews preventing her from receiving her full yearly bonus payout, was criticized by her supervisors for poor work product, and was placed on a performance improvement plan to improve her work package quality, acceptance of feedback, and her field presence. (Doc. 41-2, at 6-8; McKenzie Dep., at 368.)

Issues with Plaintiff's performance continued over multiple years; primarily, her supervisors took issue with the quality of her work packages and her ability to respond to feedback. (See e.g., Doc. 41-2, at 6-7, 9-11, 16-18.) In addition to performance issues, Plaintiff had issues throughout her employment with the time she arrived at work. (Id. at 9-14, 17-20, 24-25.)

When Plaintiff started working at Plant Vogtle, the Nuclear Maintenance Planning Department held morning meetings at 07:30 A.M. (Decl. Of Jasmine McKenzie ("McKenzie Decl."), Doc. 48-2, at 16.) At this time, she arrived to work between 07:15 A.M. and 07:30 A.M. (Id. at 21.) However, one day, the meetings changed

2

to 07:00 A.M. without prior notice. (Id. at 16.) The other planners reported to work at or around 07:00 A.M., so they were not affected by this change. (Id.) Due to this change, Plaintiff missed the morning meeting. (Id.) As a result of missing the meeting, she met with her supervisor, Mr. Kessie. (Id.) He told her the Planning Department's core hours begin at 07:00 A.M., and Plaintiff was expected to arrive to work by 07:00 A.M. (Doc. 41-2, at 11.) Plaintiff told Mr. Kessie she cannot arrive to work by 07:00 A.M. due to personal reasons, so Mr. Kessie gave her permission to arrive at work by 07:15 A.M. (Id.; Doc. 48, at 8-9.) The Planning Department meetings were then rescheduled to 07:15 A.M. "to accommodate her schedule." (Doc. 41-2, at 11.) However, Plaintiff arrived to work after 07:15 A.M. at times and "miss[ed] the morning meetings," so Planning Department supervisors eventually moved the morning meeting back to 07:00 A.M. (Id.; Decl. of Bradley David Padgett, Sr. ("Padgett Decl."), Doc. 41-5, at 3, 11; Doc. 48, at 10.)

Throughout her employment with SNOC, Plaintiff's supervisors expressed concerns over her arrival time, and she was disciplined on several occasions for arriving to work late. (Doc. 41-2, at 10, 14, 17-20, 24-25.) However, Plaintiff was an employee exempt from the Fair Labor Standards Act, and she maintains, as such, she was not required to work "core hours" because SNOC did not have a policy that set core hours for exempt employees. (Id. at 12; Doc.

3

48, at 9.) After not consistently arriving at work by 07:15 A.M., Plaintiff met with her manager, Brian Coker, and on October 16, 2018, she signed a document agreeing to arrive to work by 07:15 A.M. (Doc. 41-2, at 13; McKenzie Dep., at 149-151.) However, Plaintiff claims she did not agree to arrive at that time and was coerced into signing the document. (McKenzie Decl., at 27.) Thereafter, Plaintiff still did not consistently arrive to work by 07:15 A.M. (Doc. 48, at 10.)

In January 2019, Planning Department supervisors circulated a "Planning Department Expectations" document, which put into writing the expectations of the Planning Department. (Doc. 41-2, at 20.) This document set core hours for employees of the Planning Department as 7:00 A.M. to 4:30 P.M., but "allowed employees to shift their core hours one hour to the left," and permitted deviations from the core hours upon written approval by supervision. (Id. at 21.) Plaintiff believed this document was directed at her. (Id. at 20.)

In October 2019, Plaintiff met with her supervisor, Stephen Royal. (Id. at 24.) During the meeting, Plaintiff told him she did not agree to arrive to work by 07:15 A.M., despite signing the document a year prior agreeing to arrive no later than 07:15 A.M. (Id.) However, during this meeting, Plaintiff agreed to arrive to work by 7:30 A.M. (Id.; McKenzie Dep., at 281.) Despite this,

4

she arrived to work after 07:30 A.M. on several occasions. (See Doc. 41-2, at 25; Padgett Decl., at 30.)

Plaintiff filed a formal employee grievance in October 2018 and raised concerns she was being treated unfairly by her supervisors and was not held to the same standards as her coworkers, but upon investigation, none of her claims were substantiated. (Doc. 41-2, at 14-16.) That same year, Plaintiff's nuclear planning qualifications were taken away from her, and she was once again placed on a performance improvement plan. (Id. at 17, 20.) In January 2019, Plaintiff used SNOC's yearly survey to report her mistreatment and her "concerns about inappropriate and unprofessional behaviors exhibited by supervisors in [her] department." (Id. at 21-22.) After meeting with Mr. James March, the Employee Concerns Manager, Plaintiff's allegations were investigated, and the investigation "did not substantiate Plaintiff's allegations of unfair treatment because the investigator concluded that Plaintiff's treatment was related to her performance and excessive tardiness." (Id. at 22-23.) The investigation did, however, substantiate that two of Plaintiff's supervisors violated SNOC's work environment policy and code of ethics. (Id.) On January 22, 2020, Plaintiff met with Mr. Royal to discuss her 2019 Year-End Review. (Doc. 41-2, at 24-25.) During this meeting, they discussed Plaintiff's failure to arrive to work by 07:30 A.M, performance issues, and problems with

5

Plaintiff's work orders. (Id. at 25.) On January 23, 2020, Plaintiff submitted her letter of resignation, effective the next day. (Id. at 26.)

Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") Charge on June 2, 2020 and received a right to sue letter on August 17, 2020. (Doc. 15, at 3, 23-25.) Plaintiff alleges in her EEOC Charge that she "suffered from on-going harassment, which caused [her] to be rated negatively on [her] performance review," "was denied the opportunity to take time off to attend [her] medical appointments related to [her] pregnancy," "[was] denied promotional opportunities," and "[was] discriminated against based on [her] race (African-American), sex (female) and in retaliation for opposing unlawful employment practices, in violation of Title VII of [the] Civil Rights Act of 1964, as amended." (Id. at 23-24.)

On May 12, 2021, Defendant moved to dismiss Plaintiff's Amended Complaint "for failure to state any plausible claim upon which the Court can grant relief." (Doc. 16, at 1.) The Court subsequently dismissed Plaintiff's claims of retaliation; failure to promote; negligent hiring, training, supervision, and retention; and permitted Plaintiff's claims of race and gender discrimination under Title VII as they relate to the poor performance review and constructive discharge in January 2020, and

Plaintiff's hostile work environment claim to proceed. (See Doc. 26.)

## II. LEGAL STANDARDS

Defendant moves for summary judgment under Federal Rule of Civil Procedure 56(a). (Doc. 41.)

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation omitted and internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant

may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet its burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. Id. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant

8

must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave the Parties appropriate notice of the motion for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 43.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

### III. DISCUSSION

As a preliminary matter, this Court's September 21, 2021 Order limited Plaintiff's Title VII race and gender discrimination claims to consideration of her poor performance review received in January 2020 and her constructive discharge in January 2020. (See Doc. 26.) Therefore, any arguments made by the Parties that relate

9

to issues no longer before the Court will be disregarded. The Court first evaluates Plaintiff's Title VII race and gender discrimination claims, followed by her hostile work environment claim.

A. **Title VII Race and Gender Discrimination Claims**

Plaintiff brings claims of race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). (See Doc. 15.) Defendant argues it is entitled to summary judgment on Plaintiff's Title VII race and gender discrimination claims because: (1) she cannot establish a prima facie case of discrimination because she cannot point to similarly situated comparators who were treated more favorably than she was; (2) even if she could establish a prima facie case, Defendant had legitimate, non-discriminatory reasons for the actions it took; (3) there is no evidence Defendant's proffered reasons are pretextual; and (4) Plaintiff cannot point to a "convincing mosaic of circumstantial evidence" to support an inference of intentional discrimination. (Doc. 41-1, at 15-18.)

Title VII prohibits an employer from discriminating against an employee "because of such individual's race, color, religion, sex, or national origin." See 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may prove discrimination with direct or circumstantial evidence." Nurse v. Rhodes Fin. Serv., Inc., No. CV 117-108, 2019 WL 1114880, at *7 (S.D. Ga. Mar. 11, 2019) (citing Harris v. Shelby

Cnty. Bd. Of Educ., 99 F.3d 1078, 1082-83 (11th Cir. 1996)). Here, Plaintiff presents no evidence of direct discrimination, so the Court looks to the circumstantial evidence presented by Plaintiff.

To succeed on a Title VII claim based on circumstantial evidence, courts apply the burden-shifting framework found in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discrimination by showing: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside of her class more favorably." Lewis v. City of Union City, Ga., 918 F.3d 1213, 1220-21 (11th Cir. 2019) (en banc). Once the plaintiff has established her prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." Id. at 1221. If the defendant meets its burden, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination." Id.

1. Prima Facie Case

The Parties appear to only dispute the fourth element, whether Defendant treated similarly situated employees outside of Plaintiff's class more favorably. "[A] plaintiff asserting an intentional[]discrimination claim under McDonnell Douglas must

11

demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" Id. at 1218. Ordinarily, a similarly situated comparator: (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff"; (3) "will ordinarily . . . have been under the jurisdiction of the same supervisor as the plaintiff"; and (4) "will share the plaintiff's employment or disciplinary history." Id. at 1227-28 (citations omitted).

In her Amended Complaint, Plaintiff alleges she was treated differently in comparison to "her male and Caucasian counterparts." (Doc. 15, at 13-14.) Defendant, in its motion for summary judgment, argues that Plaintiff's claim must fail because "Plaintiff cannot identify a single comparator to meet the fourth element of a *prima facie* case of race and gender discrimination." (Doc. 41-1, at 15.) In support of this argument, Defendant submits the declaration of Bradley Padgett, Sr., who asserted, "[n]one of the other nuclear planners had the amount of consistent problems with their performance and attendance."[1] (Doc. 41-2, at 27 (citing Padgett Decl., at 8).) Plaintiff responds by arguing "any of the Plaintiff's maintenance planner coworkers would be considered as

---

[1] Plaintiff did not controvert this statement in her response to Defendant's statement of material fact or in her response brief, thus, pursuant to Local Rule 56.1, it is deemed admitted. See L.R. 56.1, S.D.Ga; and Washington v. Fanning, No.CV 116-107, 2019 WL 1117917, at *15 n.9 (S.D. Ga. Mar. 11, 2019).

similarly situated to her" as "[t]hey hold the same job titles, perform the same job duties, had to complete a planning qualification, are exempt SNOC employees, and follow the same planning guideline." (Doc. 47, at 12.) However, she only alleges generally that these unidentified employees were "similarly situated" and does not point to any evidence in support of her statement.[2] (See id.) This is insufficient to establish a prima facie case of discrimination as "[t]he plaintiff must identify a specific comparator for the fourth element — not conclusory statements that she was treated differently than members outside of her protected class." Liu v. Univ. of Miami, 138 F.Supp. 3d 1360, 1372 (S.D. Fla. 2015) (citing Woods v. Cent. Fellowship Christian Acad., 545 F. App'x 939, 945 (11th Cir. 2013)). Because Plaintiff has not established a prima facie case of discrimination,[3] the Court need not evaluate Defendant's remaining arguments.

---

[2] In her response, Plaintiff specifically identifies one potential comparator, a "maintenance planner that had an error rate two times greater than the Plaintiff." (Doc. 47, at 12.) However, Plaintiff points to this maintenance planner in relation to her having her qualifications removed, and this issue is no longer before the Court. (See Doc. 26, at 20.) Therefore, this maintenance planner cannot serve as a comparator.

[3] Moreover, even if the other planners had the same job titles, duties, qualifications, and were subject to the same guidelines as Plaintiff, the Court accepts as true that "[n]one of the other nuclear planners had the amount of consistent problems with their performance and attendance" as Plaintiff (Doc. 41-2, at 27), so they cannot serve as valid comparators because a comparator "will share the plaintiff's employment or disciplinary history." Lanier v. Sizemore, Inc., No. 6:18-cv-003, 2021 WL 4432830, at *5 (S.D. Ga. Sept. 27, 2021) (quoting Lewis, 918 F.3d at 1228).

2. Convincing Mosaic of Circumstantial Evidence

Even if the plaintiff cannot establish a prima facie case of discrimination under the McDonnell Douglas framework, a plaintiff may survive summary judgment "if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (citation omitted). This is especially useful when the plaintiff cannot point to a comparator, as is the case here. See id.

"A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual.'" Lewis v. City of Union City, Ga., 934 F.3d 1169, 1185 (citation omitted).

In this case, Defendant argues that Plaintiff has not established a convincing mosaic of evidence because there is no evidence in this case that Plaintiff's treatment was motivated by her race or gender. (Doc. 41-1, at 18-19.) Instead, Defendant argues, it repeatedly worked with Plaintiff on improving her work quality, moved her start time to accommodate her schedule, and

14

swiftly investigated and addressed her concerns about unfair treatment. (Id.) Plaintiff's response does not reference the convincing mosaic standard at all; instead, she relies solely on the McDonnell Douglas framework.[4] (See Doc. 47, at 9-13, 18-19.) Therefore, because Plaintiff has not established a prima facie case of intentional discrimination, the Court **GRANTS** Defendant's motion for summary judgment on Plaintiff's Title VII race and gender discrimination claims.

**B. Hostile Work Environment Claim**

Next, Plaintiff brings a hostile work environment claim against Defendant. (Doc. 15, at 16-17.)

"A hostile work environment claim under Title VII requires an employee to show harrassment 'sufficiently severe or pervasive to alter the conditions of [her] employment.'" Nurse, 2019 WL 1114880 at *5 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). To prevail on a hostile work environment claim, the employee must prove the following:

> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic

---

[4] Additionally, in Plaintiff's Amended Complaint, Plaintiff alleges her "membership in a protected class was a motivating factor in her supervisors discriminatory harrassment against her." (Doc. 15, at 13-14.) However, Defendant's motion and Plaintiff's response only reference the McDonnell Douglas standard, so the Court need not evaluate whether Plaintiff's race or gender were a motivating factor in any adverse employment decisions. See Case v. Eslinger, 555 F.3d 1317, 1229 (11th Cir. 2009) ("When a party moves for final, not partial, summary judgment, . . . it [becomes] incumbent upon the [nonmovant] to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in [the moving party's] favor.") (internal quotations and citation omitted).

> of the employee . . . (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Id. (quoting Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009)).

When evaluating a hostile work environment claim, the Court only considers actions that the plaintiff proves were motivated by discrimination against her protected characteristic. See id. ("[T]hese . . . allegations should not be considered in Plaintiff's hostile work environment claim because these actions were not motivated by discrimination against a protected characteristic."). "Disrespectful, unprofessional, and harassing conduct will not suffice to show a hostile work environment unless a link between that conduct and Plaintiff's status in a protected category can be shown." Graham v. Mem'l Health Univ. Med. Ctr., No. CV411-316, 2013 WL 5444733, at *5 (S.D. Ga. Sept. 30, 2013)(citing Turner v. Ga. Sec'y of State, 848 F.Supp. 2d 1361, 1381 (M.D. Ga. 2012)).

In this case, Defendant argues "[t]here is no evidence that [Defendant's] criticism of Plaintiff's work performance was based on Plaintiff's race or gender." (Doc. 41-1, at 10.) In support of its argument, Defendant points to the record where Plaintiff admitted that neither Mr. Kessie or Mr. Padgett, "made any comments to Plaintiff that she would consider offensive or derogatory

16

related to her race or gender."[5] (Doc. 41-2, at 15.) In her response, Plaintiff does not cite any evidence that connects the harrassment she complains of to her race or gender. (See Doc. 47, at 13-16.) Rather, she refers to the results of interviews of her co-workers where her work environment is called "hostile," and states that "[t]he 2018 log of 50+ performance notes should serve as evidence of Plaintiff's supervisors' frequency of harassing acts against the Plaintiff." (Id. at 15.) Neither the interview responses nor the log of performance notes connect the alleged harrassment with her race or gender.[6] Moreover, despite alleging her treatment was based on her race and gender, Plaintiff admits she had problems with the quality of her work. (See e.g., Doc. 41-2, at 25 ("Plaintiff admitted that there were issues with the quality of her work packages."[7]). Additionally, Plaintiff did not consistently arrive to work by the time Defendant told her to report by; first, she was told to arrive by 07:15 A.M., and later,

---

[5] Pursuant to Local Rule 56.1, facts in the moving party's statement of material fact are deemed admitted if not controverted. See L.R. 56.1, SDGa. Plaintiff did not controvert this statement in her response to Defendant's statement of material facts or her response brief, thus, it is deemed to be admitted.

[6] For example, Plaintiff alleges that an employee feedback response states "[t]here are people who are treated differently . . . Jasmine," and that this shows a hostile work environment. (Doc. 47, at 14.) However, this response states later that "[u]nfortunately, [Plaintiff] is called out a lot because a lot of mistakes are made in her work." (Doc. 48-5, at 38.) Viewing these interview responses in their entirety reveals that any difference in treatment Plaintiff received was due to mistakes in her work and her arrival time, not her race or gender.

[7] Plaintiff disputes this statement as "misleading." (Doc. 48, at 17.) A review of the recording of the conversation reveals that Plaintiff admitted there were problems with the quality of her work. (See Doc. 42, Def. Exhibit C, 20200122_080158.)

17

by 07:30 A.M., but she did not consistently arrive by these times. (See Doc. 41-2, at 24; McKenzie Dep., at 279, 281; Padgett Decl., at 30-32; Doc. 48, at 10.[8])

At most, there are only two allegations Plaintiff has made that can be connected in any way to her race or gender: (1) she alleges in 2016, Mr. Padgett flirted with her, and told Plaintiff on multiple occasions that he knew it was her when she walked by his office because "of the way [Plaintiff's] thighs rub together,"; and (2) in 2018, a co-worker asked her "[w]here your baby daddy at?" in response to Plaintiff stating that she could not work an outage because she did not have childcare.[9] (Doc. 41-1, at 10-11; Doc. 41-2, at 14.) The connection between these comments and Plaintiff's race and gender is rather attenuated; nevertheless, the Court will evaluate whether they objectively altered the terms or conditions of her employment.

---

[8] In its statement of material fact, Defendant states "Plaintiff admits she would come to work after the 0715 morning meetings." (Doc. 41-2, at 11.) Plaintiff disputes this as "misleading" and cites Plaintiff's Exhibit D-14 and Exhibit J. (Doc. 48, at 10; Doc. 48-3, at 6-14; Doc. 48-4, at 19-47.) The Court has reviewed these exhibits and is uncertain how they support her statement. Exhibit D-14 is a copy of the performance notes and Exhibit J shows the results of an investigation into her complaints that she was held to different expectations regarding her work schedule, which was unsubstantiated.

[9] In her Amended Complaint, Plaintiff does not allege she suffered a hostile work environment based on these incidents; however, Defendant evaluates these comments as such because the harassing conduct Plaintiff complains of must be linked to her race or gender, and these two incidents are the only incidents that can even remotely be linked to Plaintiff's race or gender. (See Doc. 15; Doc. 41-1, at 10-12.) Therefore, the Court evaluates these incidents as they pertain to Plaintiff's hostile work environment claim.

18

"To determine whether harrassment objectively altered an employee's terms or conditions of employment, courts use four factors: '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Nurse, 2019 WL 1114880, at *6 (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999)). Here, the cited comments are too infrequent to be said to have altered the terms and conditions of Plaintiff's employment. See id. at *5. Plaintiff's allegations that Mr. Padgett flirted with her refer to his conduct in 2016 when Plaintiff first started working at Plant Vogtle and ended when he became her supervisor. (See McKenzie Decl., at 168-71.) The comment about her child's father was a single, isolated comment that occurred two years later. Furthermore, these comments are not physically threatening, nor are they severe enough to impose liability on Defendant as "a hostile work environment is only created when the workplace is permeated with discriminatory intimidation, ridicule, and insult, not where there is the mere utterance of an ... epithet." Bush-Butler v. Mayor and Alderman of the City of Savannah, No. CV415-212, 2016 WL 5724442, at *7 (S.D. Ga. Sept. 29, 2016) (quoting Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276-77 (11th Cir. 2002)) (internal quotations omitted). As such,

Defendant's motion as to the hostile work environment claim is **GRANTED**.[10]

## IV. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (Doc. 41) is **GRANTED**. The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendant, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this \_\_8th\_\_ day of March, 2023.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[10] Plaintiff brought the following claims Against Defendant: (1) Title VII Gender Discrimination; (2) Title VII Racial Discrimination; (3) Retaliation; (4) Hostile Work Environment; (5) Failure to Promote; and (6) Negligent Hiring, Training, Supervision, and Retention. (See Doc. 15; Doc. 26, at 3-4.) The Court's September 21, 2021 Order dismissed her claims of retaliation; failure to promote; and negligent hiring, training, supervision, and retention. (Doc. 26, at 19.) In its motion for summary judgment, Defendant analyzes constructive discharge as a separate claim. (See Doc. 41-1, at 19-21.) Because Plaintiff does not appear to have brought a constructive discharge claim, the Court does not separately address this argument. However, any such claim would fail because, to prevail on a constructive discharge claim, the plaintiff must show "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." Nurse, 2019 WL 1114880, at *6 (quoting Bryant, 575 F.3d at 1298). "Establishing a claim for constructive discharge 'is a more onerous task than establishing a hostile work environment claim' because the plaintiff must show greater severity or pervasiveness of harassment." Id. (quoting Bryant, 575 F.3d at 1298-99). Plaintiff lacks evidence to support a hostile work environment claim; therefore, she lacks evidence to support a constructive discharge claim.